BARNES, J.,
for the Court:
¶ 1. Earl Sterling filed a petition to controvert with the Mississippi Workers’ Compensation Commission (Commission) on July 25, 2008, requesting disability benefits for an injury he claimed had resulted from his employment with Eaton Corporation (Eaton). After a hearing on the issue of compensability, the administrative judge (AJ) denied and dismissed Sterling’s claim on December 21, 2010. Sterling appealed to the full Commission on January 4, 2011. The Commission affirmed the AJ’s decision, and Sterling now appeals to this Court. See Miss.Code Ann. § 71-3-51 (Rev.2011). Finding there was substantial evidence to support the Commission’s decision, we affirm.
SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. Sterling was employed as a machinist at Eaton. On or about June 5, 2008, Sterling began wearing a new pair of steel-toed boots, which were required for his job.[1] According to Sterling, “his feet started immediately throbbing” after wearing the new boots. By Friday, June 13, a blister had developed on his foot. Sterling did not return to work the following week, telling his supervisor at Eaton that he had twisted his ankle a few days prior; he never reported an issue with the blister. After the blister popped and began draining, Sterling sought treatment from his long-time family physician, Dr. Harry Bartee, on June 20, 2008. Sterling had developed a high fever and was delirious; so Dr. Bartee admitted him to the hospital in Canton, Mississippi. Two days later, Sterling became septic, and he was transferred to Baptist Hospital in Jackson, Mississippi.
¶ 3. While Sterling was hospitalized, it was discovered that he had developed a staph infection. As a result, Sterling’s right leg was amputated below the knee on July 1, 2008. Dr. Randall Blake was the *1098 orthopaedic surgeon who operated on Sterling’s leg and performed the amputation. Dr. Blake determined that Sterling reached Maximum Medical Improvement on December 17, 2008, and, as of August 24, 2010, he had no restrictions from working if in a seated position.
¶ 4. Sterling filed a petition to controvert with the Commission on July 25, 2008. Sterling claimed the blister was a result of wearing his work boots and had caused the infection and his injury; therefore, he was owed disability benefits.[2] However, Eaton maintained that the infection had caused the blister, noting Sterling’s medical history showed that he was a diabetic. Sterling’s hemoglobin A1C test, which was taken while he was hospitalized, revealed a score of 14.4, indicating that his blood sugar had been elevated for ninety days prior to his hospital admittance.
¶ 5. After discovery and a hearing on September 23, 2010, the AJ denied Sterling benefits, noting in his order that the blister was preceded by swelling and pain in the foot. Therefore, the AJ concluded that the blister was a result of the infection, not the cause. The AJ stated that it “ha[d] clearly been shown that there could have been other causes for the blister.”
¶ 6. On appeal, the Commission affirmed the AJ’s decision, additionally finding that the medical evidence as a whole did not support a finding of causation. Sterling now appeals to this Court, and finding substantial evidence supports the Commission’s decision, we affirm.
DISCUSSION
¶ 7. Although Sterling makes several assertions on appeal, the central issue is whether the Commission erred in denying him benefits. As the “ultimate fact-finder,” the Commission has the discretion to accept or reject the AJ’s findings. Smith v. Tronox LLC, 76 So.3d 774, 778 (¶ 14) (Miss.Ct.App.2011) (citing Smith v. Masonite Corp., 48 So.3d 565, 570 (¶ 19) (Miss.Ct.App.2010)). “As with any fact-finder, the Commission is entitled to rely upon the evidence and reasonable inferences.” Id. If the Commission’s findings of fact “are supported by substantial evidence,” this Court will affirm on appeal. Id. “In other words, this Court will reverse an order of the Workers’ Compensation Commission only where such order is clearly erroneous and contrary to the overwhelming weight of the evidence.” Id. “Unless common knowledge suffices, medical evidence must prove not only the existence of a disability but also its causal connection to the employment.” Id.
¶ 8. The AJ cited Sterling’s inconsistent testimony as one of the reasons for denying the disability benefits. In a deposition taken on February 17, 2009, Sterling stated that he did not wear the boots until a couple of weeks after he bought them; yet records showed he bought the shoes months prior to the injury. However, the AJ acknowledged that the boots did not appear to be very worn. The AJ also noted Sterling’s confusion about the date of his injury and the fact that Sterling was unsure about when he developed the blister. The AJ concluded that it was “unnecessary” to evaluate the medical evidence, as Sterling “failed to meet his burden of proof’ that the blister was a result of his wearing the work boots. On appeal, the Commission affirmed the denial of bene *1099 fits, further noting that the medical evidence supported the denial of benefits. Although Sterling claimed that the wearing of his boots was the only reason that the blister could have appeared, there is no substantial evidence that Sterling’s blister caused his infection and resulted in the amputation.
¶ 9. Regarding the course of his injury, Sterling gave contradictory testimony. Although some of Sterling’s testimony indicated that the swelling and the blister occurred simultaneously, he also testified that the swelling preceded the blister’s appearance. At his deposition, Sterling said that the week before Father’s Day, his feet “swole up.” He said: “Blisters came up, and my feet swole up.”
Q. ... The first day you experienced throbbing?
A. Throbbing.
Q. And then what?
A. The next week I got up one morning to go to work. My feet was swelling. A blister came on my feet.
Yet, at the subsequent hearing before the AJ, Sterling said that his feet started throbbing the first day he wore the boots and that the swelling began the following week. He stated that the blister came after the swelling began.
A. I had the blister on top of my feet being swelling. The swelling was one thing, and the blister another.
Q. The swelling came before the blister?
A. Yes. The swelling came first.
(Emphasis added).
¶ 10. Furthermore, Sterling said the blister was on the top of his foot, which is contradictory to medical reports in the record that stated the blister was between his toes.
Q. Dr. Bartee’s records and the records from the hospital say that there is a black lesion between the fourth and fifth toe?
A. That’s where that steel toe come across my toes at.
Q. Between the toes, not on top of them. Was the blister — why did you have purulent drainage between your toes, if you didn’t know?
A. I don’t know. I don’t know.
(Emphasis added). This blister location is not consistent with the attributes of a friction blister. Eaton sought an expert opinion from Dr. Wehbeh Wehbeh, a specialist in infectious disease, who noted that the blister was between Sterling’s toes and indicated that this location was not a site normally susceptible to chafing. Moreover, as Dr. Eric McEvey noted in his June 30, 2009 deposition, typically a friction blister will not continue to grow and become more aggravated once the “aggravating object” is removed. Sterling stated that he did not wear his boots after June 13, 2008. Yet his blister continued to become more infected.
¶ 11. Although Dr. Bartee stated that Sterling told him that the area of swelling was from the boot rubbing his foot, Dr. Bartee acknowledged that he saw Sterling for a refill of medication on June 6, 2008, and Sterling reported no problems with his feet. Additionally, Sterling told his supervisor that he thought he had twisted his foot and that is why it was hurting.
Q. Now, when you went in to Swan,[your supervisor], and asked for that vacation day, what did you tell him?
A. I told him I think I had sprung my feet. But I wasn’t sure what it was.
Q. Who was the first person at Eaton that you told you had—
A. Swan.
*1100 Q. —a blister?
A. I didn’t tell nobody I had a blister.
Q. Who was the first person at Eaton you told, then, that you were having problem as a result of wearing the steel-toed boots?
A. I never told nobody I had problems there. I thought I had sprained it.
¶ 12. There was also conflicting testimony in regard to the claim that Sterling was a diabetic and, thus, susceptible to infection. Sterling said Dr. Bartee had prescribed him pills for his blood sugar two years prior to the injury, but had since taken him off the medication. Sterling claimed he had been highly active before his injury — he rode bikes, jogged, and lifted weights. Consistent with Sterling’s testimony, Dr. Bartee testified that Sterling did not need medication for diabetes, as he was in excellent physical condition. Dr. Bartee said that Sterling’s blood-sugar test results taken at his office were within a normal range and that “[t]here was no evidence of [diabetes] because of his strict diet and physical fitness.”
Q. Was Mr. Sterling diabetic prior to getting this infection?
A. Not that I knew of. I didn’t know of any diabetes at the time.
Dr. Bartee claimed the infection was what caused Sterling to become “overtly diabetic.”
Q. Was he an uncontrolled type 2 diabetic prior to this infection that we discussed?
A. No. I would say no, not that we know of. The infection caused him to be overtly diabetic and uncontrolled. It was all related to his infection.
¶ 13. However, Dr. Blake said tests performed while Sterling was hospitalized showed that he was a “poorly controlled diabetic.” Although Dr. Bartee refuted this testimony, he admitted that Sterling had been on diabetes medication two years prior to his infection and injury. The Commission, in its order, found “Dr. Blake’s testimony [to be] more credible.” Sterling tries to discredit Dr. Blake’s testimony, claiming that Dr. Blake “just guessed as to what Mr. Sterling’s past medical history might have been.” We disagree. Dr. Blake treated Sterling at the hospital. He ran tests to determine that Sterling’s blood-sugar levels for the ninety days preceding his hospitalization were abnormally high. Further, Dr. Blake testified that he had worked in the Wound Center and treated diabetics on a daily basis.
¶ 14. Dr. Wehbeh concluded in his initial opinion letter, dated September 10, 2009:
The records do not support that the claimant’s foot infection was secondary to a work-related injury. The fact that the claimant was already complaining of bilateral feet throbbing and a blister continued to enlarge even when the boots were taken off is not consistent with a friction blister. The claimant never reported to his employer that his boots caused the blister[,] and the only report of an injury to his employer was that he told his supervisor he believed he had twisted his ankle. It is more likely that the blister was secondary to a foot infection in a poorly controlled diabetic patient.
Even after reviewing Dr. Bartee’s testimony, Dr. Wehbeh did not amend his conclusions, additionally noting that Sterling’s hemoglobin A1C number was 14.4., which reflects that his blood sugar had been uncontrolled for a period of time. He remarked: “Indeed, blisters without pus can be the presenting symptom of skin and soft tissue infection in the appropriate setting. Finally staphylococcus aureus *1101 [staph], either Methicillin sensitive or Methicillin resistant (MSSA or MRSA), [is] one of the most common organisms that infect diabetic patients[.]”
¶ 15. Although Sterling contends that the testimony of Dr. Bartee, his treating physician, is superior to that of the other expert physicians, this Court has clearly held:
[W]hile a treating physician’s opinion is without question of great import, the Commission is not required to abide by it or required to give it any greater weight than other physicians’ opinions. It is the sole responsibility of the Commission to determine the credibility of the witnesses before it and, when conflicts in credible evidence arise, to determine where the preponderance of the evidence lies. Regardless of whether the Commission makes the decision to rule in line with a treating physician’s opinion, we must affirm its decision so long as it is supported by substantial evidence.
Richardson v. Johnson Elec. Auto., Inc., 962 So.2d 146, 152 (¶ 16) (Miss.Ct.App.2007). Furthermore, although Dr. Bartee stated: “Redness and pain can be from acute trauma .... It doesn’t have to be from an infection,” he admitted that a staph infection can produce a blister. Dr. McEvey additionally testified that staph will cause a “pimple, [which] can progress to a large red bump, which can progress to what’s called a boil[.]” Thus, we find there was sufficient evidence presented to support that the infection could have caused the blister.
¶ 16. Sterling complains that it was error for the AJ to comment regarding his personal experience with blisters. In his December 2010 order, the AJ observed:
It is also hard to believe that, if [Sterling] suffered a blister from friction that he did not realize in fairly close proximity to getting the blister that it was there and did not know exactly what caused it at the time. [I] cannot ignore personal experience. Having many blisters caused by friction, I knew I had them and I knew what had caused them.
This situation is different from the case cited by Sterling, Young v. Anderson, 249 Miss. 539, 546, 163 So.2d 253, 256 (1964), wherein the Mississippi Supreme Court found that the trial judge’s comments regarding his personal experience constituted reversible error as they were “unsworn testimony” presented to the jury. Here, the AJ, not a jury, was the initial finder of fact. This Court has recognized that “[w]hen [administrative] judges are ‘conducting such hearings and making decisions upon claims,’ they ‘shall have the authority of a commissioner.’” Kitchens v. Jerry Vowell Logging, 874 So.2d 456, 462 (¶ 15) (Miss.Ct.App.2004) (quoting Miss.Code Ann. § 71-3-93 (Rev.2000)). According to Mississippi Code Annotated section 71-3-47 (Rev.2000): “The commission shall have full power and authority to determine all questions relating to the payment of claims for compensation.”
By delegation, the judge receives the authority of a commissioner over a case. That is a little misleading, as a single commissioner has no authority to resolve a claim. Whatever else the language in section 71-3-93 might mean, we interpret it as a recognition that when an administrative judge is delegated responsibility for a claim, that person receives the full power of the Commission itself. When an appeal is resolved by the Commission, the administrative judge’s decision become[s] moot.
[[Image here]]
By statute, the judge is the “representative” of the Commission, its agent, and its employee in the exercise of the Com *1102 mission’s claim-resolving authority. The administrative judge is not an independent arbiter entitled to deferential review by the Commission, as a trial judge is independent of her reviewing appellate court.
Kitchens, 874 So.2d at 462 (¶¶ 16, 18) (emphasis added). On appeal, the Commission is “the ultimate fact-finder” and “may accept or reject [the] AJ’s findings.” Tronox, 76 So.3d at 778 (¶ 14) (quoting Masonite Corp., 48 So.3d at 567 (¶ 19)). “As with any fact-finder, the Commission is entitled to rely upon the evidence and reasonable inferences.” Id.
¶ 17. In this instance, the Commission “[r]eviewed the record of the proceedings” and affirmed the AJ’s findings in its order. Therefore, we find the AJ, acting under the authority of the Commission, was entitled to rely on his personal experience in making reasonable inferences and in his determination to deny benefits.
CONCLUSION
¶ 18. “An appellate court may not simply reweigh the evidence and substitute its decision for that of the Commission. Indeed, this Court has a duty to defer to the Commission when its decision can be supported.” Anthony v. Town of Marion, 90 So.3d 682, 687 (¶ 14) (Miss.Ct.App.2012) (citation omitted). Sterling testified that swelling came before the blister. While there was conclusory testimony by Sterling and Dr. Bartee that the blister must have been caused by his boots, there was also testimony by three credible physicians that the blister was a result of the infection and Sterling’s diabetic condition. There was conflicting evidence as to whether Sterling was a diabetic, but lab tests indicated that Sterling’s blood sugar had been high for approximately ninety days prior to his hospital admittance. Accordingly, we find the Commission’s decision is supported by substantial evidence and is not arbitrary or capricious.
¶ 19. THE JUDGMENT OF THE MISSISSIPPI WORKERS’ COMPENSATION COMMISSION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, MAXWELL AND FAIR, JJ., CONCUR. CARLTON, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., NOT PARTICIPATING.

. Sterling bought the boots through a private vendor approved by Eaton, and he received a stipend from Eaton to purchase his boots.

. Sterling initially claimed to have been injured on June 6, 2008; however, he later amended the date to June 5, 2008, as it was later discovered that he was not at work on June 6. Sterling admitted that his work absence on June 6 was not related to his foot. He merely went to the doctor to get some medication prescriptions refilled. The AJ later allowed Sterling to amend his petition to reflect the proper date.